USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/28/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VINCENT CITRO,

                    Plaintiff,

            -against-                                16-CV-6564 (BCM)

CAROLYN W. COLVIN, Acting                           **OPINION AND ORDER**
Commissioner of Social Security,

                    Defendant.

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Vincent Citro brings this action pursuant to § 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final determination of the Commissioner of Social Security (the Commissioner) denying his application for Supplemental Security Income (SSI). Plaintiff moves, pursuant to Fed. R. Civ. P. 12(c), to reverse the Commissioner's determination and remand for a calculation and award of benefits, or, in the alternative, to remand to the Social Security Administration (SSA) for further consideration. The Commissioner cross-moves to uphold her determination. Because the Administrative Law Judge (ALJ) failed to provide good reasons for crediting the opinion of a consultative examiner over the opinion of plaintiff's treating physician, plaintiff's motion will be GRANTED, the Commissioner's cross-motion will be DENIED, and the case will be REMANDED for further proceedings consistent with this Opinion and Order.

## I.    BACKGROUND

### A.    Personal Background

Plaintiff was born on February 15, 1968. *See* Certified Administrative Record (Dkt. No. 13) at 237, 266 (hereinafter "R. ___.") He obtained a GED in 1986. (R. 270.) He last worked loading and unloading stock for Walmart. (R. 271, 284.) He left that job in 2004 when he was injured by

a falling pallet. (R. 26-27, 40-41.) He attributes his alleged disability to a worsening of those injuries. (R. 38.)

### B.    Procedural Background

Plaintiff filed his SSI application on February 28, 2012, alleging that he became disabled as of September 19, 2011, at the age of 44. (R. 236-244, 266, 270.) He initially identified his impairments as left shoulder and spine injury (R. 270) resulting from the pallet accident in 2004. The SSA denied his application on June 8, 2012 (R. 129-36), and plaintiff timely requested a hearing before an Administrative Law Judge. (R. 139.) A hearing was held before ALJ Michael Friedman on March 21, 2013, at which plaintiff was represented by counsel. (R. 38-50.) No vocational expert testified at that hearing. In a written opinion dated April 22, 2013, the ALJ found that plaintiff was not disabled. (R. 90-101.) Plaintiff timely requested review of the ALJ's decision (R. 162), and on June 5, 2014, the Appeals Council remanded plaintiff's claim for a new hearing and decision. (R. 102-107.) On October 10, 2014, a second hearing was held before ALJ Friedman, at which plaintiff was represented by counsel. (R. 51-79.) Vocational expert Melissa J. Fass-Karlin also testified. (R. 71-76.) In a written opinion dated December 15, 2014, the ALJ again found that plaintiff was not disabled. (R. 112-120.) Plaintiff timely requested review, but the Appeals Council denied the request on June 24, 2016 (R. 18, 1-4), rendering the Commissioner's decision final.

## II.    THE MEDICAL EVIDENCE

### A.    Treatment Records

Plaintiff was treated by internist Martin Malachovsky, M.D. from 2012 through 2015.[1]

---

[1] According to the New York State Department of Health, Dr. Malachovsky is board-certified in internal medicine. *See* N.Y. State Dept. of Health, *New York State Physician Profiles*, https://www.nydoctorprofile.com/dispatch (last visited March 28, 2018).

Plaintiff first saw Dr. Malachovsky on February 7, 2012. (R. 386.) He complained of moderate neck and back pain that worsened with prolonged standing and reduced his ability to use his left arm. (R. 386.) A physical examination showed reduced cervical and lumbar ranges of motion; normal range of motion in the shoulders; mild left clavicle dislocation, with further dislocation on abduction; normal gait and normal reflexes; and a negative (normal) straight leg raise test. (R. 395.) Dr. Malachovsky diagnosed lower back pain, neck pain, and internal shoulder derangement (*id.*), ordered x-rays of plaintiff's cervical spine, left shoulder, and chest, and referred him for physical therapy. (R. 387, 389-92.)

X-rays of plaintiff's shoulder, taken on February 7, 2012, showed severe, chronic shoulder separation, widening of the coracoclavicular distance, and a focus of heterotopic ossification between the acromion and the distal clavicle. (R. 319.) X-rays of plaintiff's spine showed no scoliosis or fracture, but revealed mild degenerative disc disease at L3-L4, mild retrolisthesis (displacement) at L2-L3 through L4-L5, and facet joint arthrosis at L5-SI. (R. 321-22.)

Plaintiff was seen by physical therapist Marie Roach from March 7 through May 2, 2012, for neck and back therapy. (R. 341, 347-49, 356-372, 450-58.) At plaintiff's first session, he reported a pain level of 8.5 out of 10, aggravated by inclement and cold weather and carrying more than 40 pounds with his left hand. (R. 342.) Roach's initial physical examination showed strength of 4/5 in shoulder extension in the right upper extremity and left upper extremity, with slightly decreased range of motion; decreased range of motion in the right lower extremity; straight leg raise test to 70 degrees bilaterally; decreased range of motion in the cervical spine, and a sway-back spinal posture with thoracic area displaced backward and pelvis forward. (R. 342-44.)

When plaintiff saw Dr. Malachovsky on May 9, 2012, he stated that he felt "somewhat better" since going to physical therapy, that his back pain was "more tolerable," and that he was

not taking pain medication. (R. 456.) A physical examination showed reduced range of motion in the cervical spine, lateral flexion to 10 degrees, normal anterior flexion, mild paraspinal tenderness around C3-C5, and mild thoracic kyphosis of the upper back. (R. 457.) Plaintiff had a normal range of motion in the shoulders, but on abduction of his left arm the "clavicle dislocates further," and a mild left clavicle dislocation was noticeable at rest. (*Id.*) Dr. Malachovsky also noted reduced anterior flexion, muscle tenderness, and reduced flexion in the lower back, but a normal gait and reflexes, and a negative straight leg raise test. (R. 456-57.) Plaintiff requested "something for pain besides PT," and Dr. Malachovsky prescribed Tylenol #3,[2] while also advising plaintiff to continue physical therapy. (R. 457.)

Plaintiff was discharged from physical therapy on May 15, 2012. (R. 435.) On June 8, 2012, Roach noted that plaintiff reported "some minor temporary decrease in pain" but that he "needed to correct his posture to make any significant change in his pain level." (R. 436.) She reported that plaintiff "had been given a [home exercise program (hep)] to work on" and was being discharged because he could "continue to work on his deficits with his hep." (R. 435.) Plaintiff's May 18, 2012 examination by Dr. Malachovsky was unchanged from his May 9, 2012 examination. (R. 464-65.)

On August 15, 2012, Dr. Malachovsky noted that plaintiff's lower back pain was "exacerbated," referred him to physical therapy again, and prescribed Vicodin and Cymbalta. (R. 440.)[3] Plaintiff saw Dr. Malachovsky again on August 17, 2012, at which point his physical

---

[2] Tylenol 3, which contains codeine, is used to relieve "mild to moderately severe pain." *See* Mayo Clinic, *Acetominophen and Codeine (Oral Route)*, https://www.mayoclinic.org/drugs-supplements/acetaminophen-and-codeine-oral-route/description/drg-20074117 (last visited March 26, 2018).

[3] Vicodin, which contains acetaminophen and hydrocodone, is used to relieve "moderate to moderately severe pain." *See* Mayo Clinic, *Hydrocodone and Acetaminophen (Oral Route)*, https://www.mayoclinic.org/drugs-supplements/hydrocodone-and-acetaminophen-oral-

examination was unchanged and he reported that his lower back pain improved with Vicodin. (R. 447-48.) On February 4, 2013, Dr. Malachovsky continued plaintiff on Vicodin and referred him to an orthopedist for further evaluation of internal derangement of his left shoulder and possible surgery. (R. 524-25.)

On February 11, 2013, plaintiff was seen by Sean Thompson, M.D.,[4] an orthopedic surgeon, for a pre-operative evaluation of his left shoulder. (R. 782.) Physical examination revealed a marked deformity of the left shoulder with tenting of the skin of the left clavicle that was not freely mobile and fixed, external rotation to 80 degrees bilaterally, internal rotation to L3 on the right and L5 on the left, and a positive cross-arm abduction and Neer test. (*Id.*)[5] Dr. Thompson diagnosed chronic acromioclavicular joint injury (shoulder separation) with subacromial impingement. (*Id.*)

An MRI of the left shoulder on February 15, 2013, showed subcortical cyst-like changes,[6] mild thickening and fraying of the distal supraspinatus tendon, a low grade partial articular surface

---

route/description/drg-20074089. Cymbalta (duloxetine) is used to treat depression and anxiety, as well as chronic pain. *See* Mayo Clinic, *Duloxetine*, https://www.mayoclinic.org/drugs-supplements/duloxetine-oral-route/description/drg-20067247 (last visited March 26, 2018).

[4] According to the New York State Department of Health, Dr. Thompson is board-certified in orthopaedic surgery. *See* N.Y. State Dept. of Health, *New York State Physician Profiles*, https://www.nydoctorprofile.com/dispatch (last visited March 28, 2018).

[5] "The Neer Test is commonly used in orthopedic examinations to test for subacromial impingement," which is a form of rotator cuff disease. *See* Physical Therapy Web, *Neer Test – Orthopedic Shoulder*, http://physicaltherapyweb.com/neer-test-orthopedic-shoulder-examination/ (last visited March 27, 2018).

[6] "Subcortical cysts are radiolucent areas on x-ray that represent damaged or thinning bone. They are typically seen adjacent to arthritic joints and result from excessive forces acting on the bone over an extended period of time. They are believed to be 'pre-erosive' in that they can lead to erosive destruction of the area if the excessive forces are not mitigated in some way. They are not dangerous in and of themselves, but do represent a more advanced stage of arthritic change in most cases." *See* Just Answer, *What is a subcortical cyst? Bone on bone contact separate…*, https://www.justanswer.com/neurology/7008m-subcortical-cyst-bone-bone-contact-separate-left-posterolateral-s-cyst-i-hav.html (last visited March 27, 2018).

tear at the insertion of the anterior leading-edge of the infraspinatus tendon, and a tear of the posterior superior glenoid labrum. (R. 787-88.) On February 25, 2013, during a follow-up appointment, Dr. Thompson noted that plaintiff had "failed conservative management," including physical therapy, and that notwithstanding treatment with anti-inflammatories "his symptoms have been worsening." (R. 784.) Dr. Thompson scheduled plaintiff for an anthroscopic rotator cuff and labral repair, which was performed on March 6, 2013. (R. 784, 779-81.)

On March 11, 2013, following the surgery, Dr. Malachovsky prescribed Oxycodone[7] and advised plaintiff to follow up with an orthopedist. (R. 545-46.) Plaintiff saw Dr. Malachovsky again on April 15, 2013, for medication refills and a thyroid test. (R. 549.) Plaintiff reported improvement in the mobility of his left shoulder, although he was still in some pain. (R. 549-50.) Dr. Malachovsky continued Oxycodone and ordered additional physical therapy. (R. 550.)

On June 7, 2013, plaintiff was seen by Dr. Thompson for post-surgery follow up. (R. 785.) Examination of the left upper extremity revealed forward flexion to 140 degrees and abduction to 120 degrees without difficulty, with negative impingement tests. (*Id.*) Dr. Thompson noted that plaintiff still complained of pain with weather changes, "consistent with arthropathy of the glenohumeral (shoulder) joint." (*Id.*) Dr. Thompson prescribed Ultram[8] as needed. (*Id.*) On re-evaluation on June 17, 2013, Dr. Thompson noted that plaintiff was doing well and was able to "forward flex to 120 degrees, abduction to 110 degrees, pain free." (R. 786.)

---

[7] Oxycodone is a narcotic analgesic used to relieve "moderate to severe pain." *See* Mayo Clinic, *Oxycodone (Oral Route)*, https://www.mayoclinic.org/drugs-supplements/oxycodone-oral-route/description/drg-20074193 (last visited March 26, 2018).

[8] Ultram (tramadol) is an opioid analgesic used to relieve "moderate to moderately severe pain, including pain after surgery." *See* Mayo Clinic, *Tramadol (Oral Route)*, https://www.mayoclinic.org/drugs-supplements/tramadol-oral-route/description/drg-20068050 (last visited March 26, 2018).

On September 5, 2013, plaintiff told Dr. Malachovsky that he continued to have chronic back pain with intermittent radiation down his left leg. (R. 668.) A physical examination of plaintiff's neck, upper spine, and shoulders was normal, but with regard to plaintiff's lower back Dr. Malachovsky noted reduced anterior flexion, paraspinal tenderness, and decreased range of motion, but with normal gait and reflexes and a negative straight leg raise test. (R. 669.) Dr. Malachovsky ordered an MRI of plaintiff's lumbar spine. (*Id.*)

An MRI on September 9, 2013, revealed mild retrolisthesis (displacement) at L2-L3, L3-L4, and L4-L5, with no disc herniation, spinal stenosis, or foraminal narrowing; mild disc bulging at L2-L3, L3-L4, and L4-L5, with small superimposed right foraminal disc extrusion at L4-L5 mildly impinging on the right L4 nerve root sheath; mild to moderate L4-L5 facet osteoarthritis with no spinal stenosis; and a mild L5-S1 disc bulge with superimposed mild broad-based central disc herniation contacting both S1 nerve root sheaths without posterior displacement. (R. 512-13.) At a visit on September 13, 2013, Dr. Malachovsky noted that the MRI showed "several herniated discs with some nerve compression." (R. 672.)

There was no significant change in plaintiff's condition at subsequent visits with Dr. Malachovsky on October 7 and November 5, 2013. (R. 676, 679.) During physical examinations from January 9, 2014 through April 4, 2014, Dr. Malachovsky continued to note reduced anterior flexion and paraspinal tenderness in plaintiff's lower back. (R. 683-97.) During this period plaintiff was maintained on Percocet.[9]

---

[9] Percocet is a combination of oxycodone and acetaminophen. It is used to relieve "moderate to moderately severe pain." *See* Mayo Clinic, *Oxycodone and Acetominophen (Oral Route),* https://www.mayoclinic.org/drugs-supplements/oxycodone-and-acetaminophen-oral-route/description/drg-20074000 (last visited March 26, 2018).

On March 28, 2014, plaintiff was seen by Peter Passias, M.D.,[10] at the NYU Hospital for Joint Disease, for back pain. (R. 585.) An x-ray of his lumbar spine, taken that day, revealed mild dextroconvex curvature with slight reversal of the normal lumbar lordosis with multilevel degenerative disc disease, associated discovertebral hypertrophic change, and mild retrolisthesis at L2-3, L3-4, and L4-5, as well as possible mild degenerative remodeling of the sacroiliac joint. (R. 588.) Plaintiff was referred to pain management (R. 587), but the record does not contain any further treating notes from NYU.

On July 17, 2014, plaintiff was seen by Christine Hinke, M.D.,[11] at Mount Sinai Beth Israel Hospital, for evaluation of his neck, lower back, and left shoulder pain. (R. 825.)[12] Plaintiff reported low back pain fluctuating in intensity between 4/10 and 10/10, with a pain level at the time of the examination of 3/10, made worse with "extreme cold weather and humidity" and alleviated by "rest, recumbency, light exercise, and heating pads." (*Id.*) Plaintiff also reported "some residual intermittent left shoulder pain." (*Id.*) Dr. Hinke performed a physical examination of plaintiff, noting limited lumbar flexion, "palpable bilateral lumbar spasm," and reduced core

---

[10] According to the New York State Department of Health, Dr. Passias is board-certified in orthopaedic surgery. *See* N.Y. State Dept. of Health, *New York State Physician Profiles*, https://www.nydoctorprofile.com/dispatch (last visited March 28, 2018).

[11] Dr. Hinke is board-certified in physical medicine and rehabilitation. *See* N.Y. State Dept. of Health, *New York State Physician Profiles*, https://www.nydoctorprofile.com/dispatch (last visited March 28, 2018).

[12] It appears that Dr. Hinke's treatment notes were handed to the ALJ at the October 10, 2014 hearing. (R. 68-70.) They were then resubmitted to the SSA (along with other medical records) on March 30, 2015, when plaintiff sought review from the Appeals Council. (R. 318.) Even if ALJ Friedman had not been given Dr. Hinke's notes at the hearing, they "relate to the period on or before the ALJ's decision" and therefore, once timely submitted to the Appeals Council, became part of the "entire administrative record," which this Court not only may but must review to determine whether the agency decision is supported by substantial evidence. *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (citing *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996)).

strength, as well as increased pain on lumbar flexion, extension plus right lateral rotation, and right lateral bending and extension. (R. 826.) Dr. Hinke also reviewed plaintiff's prior x-rays and MRI, noting that the "most significant findings" were "degenerative disc disease and spondylosis associated with degenerative scoliosis and retrolisthesis." (R. 826-7.) "These abnormalities," she explained, "correlate well with his pain symptoms and clinical examination." (R. 827.) Dr. Hinke recommended against lumbar surgery or epidural steroid injections, because they were not likely to improve plaintiff's condition and, in the case of injections, "the risk outweighs the benefit." (*Id.*) She concluded that the "mainstay of treatment would be exercise and pain medications," including Percocet, "to remain as active as possible." (*Id.*)

On September 4, 2014, plaintiff saw Dr. Malachovsky for a refill of his medications and reported that his symptoms remained unchanged. (R. 861.) On October 1, 2014, Dr. Malachovsky's physical examination revealed – in addition to the reduced flexion and tenderness in the lower back previously noted – a "chronically displaced clavicle" in plaintiff's left shoulder. (R. 864.) Dr. Malachovsky continued plaintiff on Percocet and advised him to follow up with pain management and orthopedics. (*Id.*) Subsequent progress notes show that plaintiff continued to report ongoing lower back and left shoulder pain, for which he continued to take Percocet and undergo physical therapy. (R. 866-72.)

### B.    Opinion Evidence

#### 1.    Treating Physician Dr. Malachovsky

In a Multiple Impairment Questionnaire dated April 18, 2012, completed after his first two office visits with plaintiff, Dr. Malachovsky observed that plaintiff had a reduced range of motion in the neck, reduced lumbar flexion, left clavicular dislocation, and thoracic kyphosis. (R. 374.) He noted that x-rays showed a continuous dislocation and degenerative spinal disease. (*Id.*)

Plaintiff's primary symptoms were chronic daily pain in the neck, lower back, and left arm, precipitated by movement. (R. 375-76.)

Dr. Malachovsky rated plaintiff's pain as moderate to severe (R. 376) and opined that in an eight-hour workday, plaintiff could sit for one hour or less, and stand or walk for one hour or less. (*Id.*) In Dr. Malachovsky's opinion plaintiff could never lift or carry even five pounds and had significant limitations in repetitive reaching, handling, fingering, or lifting because of the clavicular dislocation. (R. 377.) In addition, according to his treating physician, plaintiff had "marked" limitations (defined as "essentially precluded") in his ability to use both arms for reaching (including overhead) and moderate limitations (defined as "significantly limited but not completely precluded") in his ability to use his arms to grasp, turn, and twist objects and use his fingers and hands for fine manipulations. (R. 377-78.) Dr. Malachovsky opined that plaintiff's symptoms would interfere with his attention and concentration such that he would require unscheduled rest breaks every 20-30 minutes during an eight-hour workday, each break lasting 10-15 minutes on average. (R. 379.) Dr. Malachovsky estimated that plaintiff was likely to be absent from work more than three times a month. (R. 380.)

Two months later, in a letter dated June 29, 2012, Dr. Malachovsky provided a summary of plaintiff's conditions (R. 467), noting that his pain had improved with physical therapy and Motrin but his overall prognosis was "guarded." (*Id.*) Dr. Malachovsky opined that plaintiff could not perform "full time physical competitive work." (*Id.*)

On August 31, 2014, Dr. Malachovsky completed a detailed Disability Impairment Questionnaire (R. 792-796), again noting that plaintiff's back and shoulder pain occurred daily and were aggravated by movement and bending. (R. 793.) Dr. Malachovsky stated that he relied in part on plaintiff's x-rays, MRI, and CT scan (not part of the record here) for his diagnosis. (R.

792.) He opined, again, that in an eight-hour workday, plaintiff could sit for one hour or less, stand or walk for one hour or less, and when sitting would need to stand up every 20-30 minutes and take 5-10 minute breaks. (R. 794-95.) According to Dr. Malachovsky, plaintiff could not lift a weight over five pounds, or carry a weight of any kind. (R. 794.) Plaintiff had moderate limitations in using his left hand to grasp, turn, and twist objects and perform fine manipulations, and marked limitations in using his left arm for reaching. (R. 795.) Dr. Malachovsky reiterated that plaintiff would likely be absent from work more than three times each month. (R. 796.)

That same day, in a letter addressed "to whom it may concern," Dr. Malachovsky noted that despite physical therapy, pain management, and shoulder surgery (which was "not successful" in resolving plaintiff's chronic acromioclavicular dislocation), plaintiff continued to experience chronic pain and physical limitations. (R. 791.) Dr. Malachovsky thought it "unlikely" that plaintiff could "sustain a job with performance of up to 8 hours a day," and noted that plaintiff's prognosis was "poor" because "the symptoms will likely be ongoing." (*Id*.)

On March 20, 2015 – after the ALJ's second written decision – Dr. Malachovsky submitted a letter reiterating his opinion that if plaintiff attempted to work he would be "limited to sitting for a maximum of 1 hour and standing or walking for a maximum of 1 hour during an 8-hour workday." (R. 860.) Dr. Malachovsky added that it was "medically necessary" for plaintiff to avoid "continuous sitting" and instead to get up and move around "every 20 to 30 minutes." (*Id*.) In Dr. Malachovsky's view plaintiff also had significant limitations with "reaching, handling, and fingering objects," was "precluded from carrying any weight," could "only occasionally lift a maximum of five pounds," and "would likely experience excessive absences" if employed. (*Id*.)

### 2.    Consultative Examiner Dr. Sarreal

Consultative examiner Antero Sarreal, M.D.[13] conducted an examination of plaintiff on May 11, 2012, prior to plaintiff's first ALJ hearing. (R. 407.) Dr. Sarreal noted that plaintiff arrived at the examination by bicycle. (R. 409.) Plaintiff used no assistive devices, needed no help getting on and off the exam table, and could rise from a chair without difficulty. (*Id.*) Dr. Sarreal observed that plaintiff walked with a slight limping gait to avoid pressure on his left hip. (*Id.*) Plaintiff had a limited range of motion in the cervical and lumber spine, with muscle tenderness and sacroiliac joint tenderness, but no trigger points or spasm. (*Id.*) Dr. Sarreal observed a "prominence of the left clavicle," with a separation of the left acromioclavular joint, and a limited range of motion in the left shoulder. (*Id.*) In the thoracic and lumbar spines, Dr. Sarreal observed limited flexion, extension and rotary movements, but no evidence of scoliosis or kyphosis. (R. 409-10.)

Dr. Sarreal diagnosed, *inter alia*, left shoulder acromioclavicular separation, neck derangement, and low back derangement. (R. 410.) He opined that plaintiff had "mild to moderate" limitations in lifting and carrying heavy objections, pushing and pulling, prolonged standing, climbing stairs, squatting, walking long distances, frequent bending, and prolonged sitting. (*Id.*) He further opined that plaintiff had limitations in reaching in all directions with his left arm. (*Id.*) Plaintiff had no limitations in fine and gross hand dexterity and manipulation. (*Id.*)

### 3.    Consultative Examiner Dr. Chow

Consultative Examiner Irene Chow, D.O., performed neurologic and internal medicine evaluations of plaintiff on September 22, 2014, between his first and second ALJ hearings. (R.

---

[13] The Court was unable to find any information concerning Dr. Sarreal on the New York State Department of Health website, *see* N.Y. State Dept. of Health, *New York State Physician Profile*, https://www.nydoctorprofile.com/dispatch (last visited March 28, 2018), and thus cannot confirm his credentials.

799, 812.)[14] Although Dr. Chow asked plaintiff about his medical history, there is no evidence that she reviewed any of his prior medical records. Plaintiff told Dr. Chow that he could cook, clean, do laundry and grocery shopping, shower, and dress himself, "and sometimes rides a bike." (R. 801.) On examination, plaintiff appeared to be in no acute distress, had normal gait and station, could walk on his heels and toes, required no assistive devices, and did not need help changing for the examination, getting on and off the examination table, or rising from a chair. (*Id.*) In her neurologic evaluation, Dr. Chow found a "normal range of motion of the cervical, thoracic and lumbar spine," with "no spinal tenderness or muscle spasm." (R. 802.) In her internal medicine evaluation, she reported that the lumbar spine – which plaintiff indicated as a "site of pain" – "shows full flexion, extension, lateral flexion, and full rotary movement bilaterally." (R. 815.) Dr. Chow did note "a prominent bony protuberance of the acromion at the shoulder joint" with mild atrophy around that area. (R. 802, 815.) "Based on today's examination," Dr. Chow assessed "mild limitations" in lifting, carrying, pushing, pulling, and reaching overhead with the left upper extremity, but no other exertional limitations. (R. 803, 816.)

Based on the same examination, Dr. Chow completed a Medical Source Statement of Ability to do Work-Related Activities (Physical). (R. 804.) She opined that plaintiff could lift and carry up to 50 pounds "frequently" (1/3 to 2/3 of an eight-hour day) and up to 100 pounds "occasionally" (up to 1/3 of an eight-hour day); that he could sit, stand or walk for up to eight hours during an eight-hour work day (R. 805); that he could "continuously" handle, finger, and feel with his left hand; and that he could "frequently" reach, push, and pull with that hand. (R. 806.) Dr. Chow found no right hand limitations. (*Id.*)

---

[14] Dr. Chow is a family medicine specialist with no other board certifications. *See* N.Y. State Dept. of Heath, *New York State Physician Profile*, https://www.nydoctorprofile.com/dispatch (last visited March 28, 2018).

### III. HEARINGS

At his first ALJ hearing on March 21, 2013 (just a few weeks after plaintiff's shoulder surgery), plaintiff explained that he sustained injuries to his head, face, shoulder, neck, and back when a 65-pound pallet fell on him at work in 2004. (R. 40-41.) Since then, plaintiff had been unable to work due to pain in his left shoulder, arm, lower back, and neck. (R. 38, 42-44.) His pain was worse when the weather was "cold, damp." (R. 43-44.) Plaintiff stated that he could stand for "close to an hour," sit for about 45 minutes to one hour, and walk three to four blocks at a time. (R. 43-44.) He could lift five to ten pounds with his right arm, but was unable to lift any weight with his left arm. (R. 44.) He testified that he lived with a cousin, that he liked to read and draw, and that he helped his cousin shop for groceries, cook, and clean. (R. 45.) He was able to carry "small loads" such as one bag of groceries at a time, and walk the dog. (R. 46-47.) On examination by his counsel, plaintiff testified that he was only able to sleep three to four hours at a time because of pain, and at times he lay down "pretty much the whole day" in an attempt to relax his lower back. (R. 47.) Plaintiff stated that his pain had increased over time. (R. 49.)

At the second hearing, on October 10, 2014, plaintiff testified that physical therapy and medication did not fully alleviate his pain. (R. 56-57.) He told the ALJ that he could stand "[u]ntil I get tired" and could sit for "[m]aybe about a half hour, 20 minutes," or "sometimes two hours" at a time, depending on "how I feel in my back." (R. 58-59.) Plaintiff testified that he would not be able to perform a seated job that required occasional standing because his medication (at that point, Percocet) caused him at times to not be "fully focused," and because weather conditions exacerbated his back pain. (R. 61.)[15] Plaintiff estimated that he would require breaks of 10-15

---

[15] There is no other evidence in the record indicating that plaintiff experienced any side effects from his medication.

minutes after sitting for one hour. (R. 65-66.) He testified that he could walk "a distance," but was never asked how long that distance was. (R. 59.) He told the ALJ that his right arm was "fine," and that on days when his pain was not too severe, he could paint or draw for two to three hours per day (with breaks for artistic reflection). (R. 64-65.) Plaintiff testified that he could lift his arms above his head but some days was unable to do so because of his back condition. (R. 66-67.) He reported that he could lift 15-25 pounds with his right arm but tried not to do so with his left arm because it caused pain. (R. 67.)

The ALJ then called vocational expert Fass-Karlin, and asked her to assume "a light physical RFC [residual functional capacity] restricted against jobs involving excessive pulmonary irritants," with use of the left arm limited to "occasional overhead reaching" and "occasional reaching out and reaching back." (R. 72.) The expert testified that an individual with these restrictions could work as a marker (222,114 jobs in the national economy), an usher (84,843 jobs), or a counter clerk (153,392 jobs). (R. 73.) When the ALJ asked plaintiff if he thought he could work as an usher, plaintiff said, "it wouldn't be steady due to how I feel." (R. 75.) Fass-Karlin then confirmed that "light work" generally permitted only two sick days per month and no more than 10% "time off task" during the workday. (*Id*.) The ALJ then remarked, and the vocational expert confirmed, that "at the sedentary level with these restrictions there's no significant number of jobs." (*Id*.)[16]

---

[16] The record also includes a transcript of a hearing held before ALJ Friedman on September 6, 2011 presumably in connection with an earlier benefits application by plaintiff, during which he was not counseled. (R. 23-34.) At the 2011 hearing, plaintiff testified that he experienced pain when the weather was bad, and that on those occasions he stayed home, walked his dog, and drew. (R. 29.) When weather conditions permitted, plaintiff testified that he could "walk, stand" and do "everything," (*id*.), including sitting, but that he was not able to sit on hard chairs. (R. 30.) Plaintiff also testified that he could lift and carry up to 35 pounds.

## IV.     ALJ DECISION

### A.     Standards

In his December 15, 2014 decision, the ALJ correctly set out the five-step sequential evaluation process used pursuant to 20 C.F.R. § 416.920(a) to determine whether a claimant over the age of 18 is disabled within the meaning of the Act. (R. 113-14.) The Second Circuit has described the sequence as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1 . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Jasinski v. Barnhart*, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted). If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. § 416.920(a)(4).

A claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at the fifth step. *See Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). To determine the claimant's RFC at step four, "the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010) (internal citations omitted); *see also* 20 C.F.R. § 416.929(a) ("[W]e consider all your symptoms, including pain, and the extent to which

your symptoms can reasonably be accepted as consistent with the objective medical evidence, and other evidence . . . [h]owever, statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain.").

To support a finding that the claimant is not disabled at step five, the Commissioner must offer evidence demonstrating that other work exists in significant numbers in the national and local economies that the claimant can perform, given the claimant's RFC, age, education, and past relevant work experience. *See* 20 C.F.R. §§ 416.912(f) (2015), 416.960(c). "Under the law of this Circuit and the SSA Guidelines, the ALJ must call a vocational expert to evaluate a claimant's significant non-exertional impairments in order to meet the step five burden." *Lacava v. Astrue*, 2012 WL 6621731, at *18 (S.D.N.Y. Nov. 27, 2012) (citations omitted), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

## C.    Application of Standards

The ALJ issued two decisions in this matter, dated April 22, 2013 and December 15, 2014. Since it is the 2014 decision that is at issue in this action, references to the 2013 decision are included only where necessary for context. At step one, the ALJ found (in both decisions) that plaintiff had not engaged in substantial gainful activity since February 28, 2012, the application date. (R. 92, 114.)

At step two, the ALJ originally found that plaintiff suffered from two "severe" impairments: "status post arthroscopic repair of left shoulder, and mild degenerative disc disease of the lumbar spine." (R. 92.) In his 2014 opinion the ALJ identified three severe impairments: "left shoulder rotator cuff and labral tear with synovitis and acromioclavicular joint impingement, emphysema, and back pain." (R. 92, 114.)

At step three, the ALJ concluded that none of plaintiff's severe impairments met or medically equaled any listed impairment. (R. 115.) In 2014 he considered Listings 1.02 (major dysfunction of a joint), 1.04 (disorders of the spine) and 3.00 (respiratory disorders). *Id.*[17]

At step four, the ALJ found in his 2013 opinion that plaintiff had the RFC to perform "the full range of light work as defined by 20 C.F.R. § 416.967(b)." (R. 93.)[18] In 2014, he again concluded that plaintiff could perform "light work," in that he could "sit, stand and walk for 6-hours in an 8-hour workday" and could lift and carry "20-pounds occasionally and 10-pounds frequently with his right arm" (R. 115), but found that plaintiff was further "limited to only occasional overhead reaching, reaching out and back with his left arm, and he cannot work in an environment with exposure to excessive pulmonary irritants." (R. 115.) It is this determination that plaintiff challenges, arguing that the ALJ did not properly weigh the medical opinion evidence, *see* Pl. Mem. (Dkt. No. 13) at 14, and did not properly evaluate plaintiff's credibility. *Id.* at 20.

In determining plaintiff's RFC, ALJ Friedman correctly summarized the two-step process set out in *Genier*, 606 F.3d at 49 and 20 C.F.R. § 416.929, stating that he was first required to determine "whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the claimant's pain or other symptoms," and then to "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's [ability to work]." (R. 116.)

---

[17] Plaintiff does not challenge the ALJ's findings with respect to plaintiff's emphysema, which was "mild." (R. 115, 116.)

[18] Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." 20 C.F.R. § 416.967(b).

Although the ALJ did not explicitly find that plaintiff's underlying medically determinable physical impairments "could reasonably be expected to produce" the pain symptoms he reported, it appears that he impliedly so found, because he went on to state that the "objective records do not substantiate the claimant's subjective allegations to the degree that he could not perform a wide range of work with restrictions." (R. 116.)

In making this determination the ALJ relied on plaintiff's hearing testimony, which he described as confirming that that plaintiff "is able to stand until he gets tired," "can sit up to 2-hours," "is able to walk quite a distance," and is able to use both hands "despite the shoulder pain because he is an artist." (R. 116.) The ALJ also noted that plaintiff "stated that he could lift a 20-10 pound bag of groceries with his right arm and is able to travel by public transportation and on his own." (*Id*.)[19] The ALJ also noted that plaintiff "showed no apparent discomfort while sitting or ambulating" at the hearing. (R. 119.)

The ALJ also found that plaintiff's allegations were not supported by the underlying treatment notes and medical imaging, noting that he consistently displayed a normal gait, reflexes, and strength, and that his x-rays revealed "only mild degenerative disc disease," "grade 1 retrolisthesis," and "facet joint arthrosis." (R. 116-17.) Moreover, according to the ALJ, there were

---

[19] This is not entirely accurate. Plaintiff testified that he could lift "a five to ten-pound grocery bag." (R. 59.) Moreover, with regarding to his drawing, plaintiff made it clear that while on good days he could draw for two to three hours, on bad days – including during rainy weather – "I lie down and rest . . . [a]nd take the pills." (R. 63-65.) There are some other discrepancies between the 2014 written opinion and the underlying record. For example, the ALJ described plaintiff as "currently recovering from surgery." (R. 116.) In fact, plaintiff's shoulder surgery was in March 2013, more than a year and a half prior to the October 10, 2015 hearing. (R. 66.) In addition, the ALJ wrote, "According to the claimant, pain medication does not help to relieve his shoulder discomfort and he now has lower back pain." (R. 116.) Plaintiff's actual testimony was that pain medication helped him "[t]o a point, not to the fullest," that his back pain was a problem of long standing (as the ALJ noted elsewhere in his opinion), and that "[t]he worst pain is in my back." (R. 56, 57.)

"significant improvements in [plaintiff's] condition" after his 2012 course of physical therapy. (R. 117.)[20] With regard to plaintiff's September 9, 2013 MRI (not available at plaintiff's first hearing), the ALJ noted that it showed "subtle degenerative restrolithesis" in the lumbar spine, "only mild diffuse disc bulges at L4-L5," with "mild impingement" on the right L4 nerve root, "only mild to moderate L4-L5 facet osteoarthritis," and "mild" disc bulging at l5-S, L3-L4, and L2-L3. (*Id.*)

In considering the medical opinion evidence, the ALJ assigned "some but neither substantial or controlling little [sic] weight" to Dr. Malachovsky's opinion, particularly his opinion that plaintiff could "only occasionally lift but never carry more than 5-pounds and never lift or carry any weight," because "it is inconsistent with the evidence," including the medical imaging and plaintiff's hearing testimony that he "can stand until he gets tired," travels on the subway, and paints "as long as the weather does not cause him physical discomfort." (R. 118.) The ALJ further concluded that "Dr. Talavera's assertion that the claimant would be absent from work 4 days per month is not documented in the record." (*Id.*)[21] The ALJ did not discuss Dr. Malachovsky's opinions that plaintiff could not sit or walk for more than one hour; that when sitting he would need to stand up every 20-30 minutes and take 5-10 minute breaks; and that he had "marked" limitations in using his left hand for reaching. (R. 794-95.)

---

[20] In fact, according to the contemporaneous treating notes of therapist Roach, plaintiff reported "some minor temporary decrease in pain." (R. 436.) Three months later, on August 15, 2012, Dr. Malachovsky noted that plaintiff's lower back pain was "exacerbated," referred him to physical therapy again, and prescribed Vicodin and Cymbalta. (R. 440.) Two years later, on August 31, 2014, Dr. Malachovsky wrote that despite physical therapy and other pain management treatments – not to mention surgery on his shoulder, which was "not successful" – plaintiff continued to experience "chronic" pain and physical limitations, and had a "poor" prognosis because "the symptoms will likely be ongoing." (R. 791.)

[21] There are no opinions from "Dr. Talavera" in the record. Dr. Malachovsky's opinion was that plaintiff would likely be absent more than three days per month. (R. 380, 796.)

In contrast, the ALJ assigned "substantial weight" to Dr. Chow's opinion that plaintiff had "only mild" limitations, mostly involving reaching overhead with the left shoulder, because it was consistent with her "thorough" examination of the plaintiff, plaintiff's testimony at the hearing, and the medical imaging. (R. 118-19.) The ALJ did not discuss the fact that Dr. Chow never saw plaintiff's x-rays or MRI. Nor did he mention that Dr. Chow – a family medicine specialist with no board certification in orthopedics, physical medicine, or pain management – is the only medical professional who did *not* find any reduced range of motion or flexion, any tenderness, or any spasm in plaintiff's lower back. *Compare* R. 802 (Chow) *with* R. 395, 456, 669, 683-97 (Malachovsky), R. 342-44 (Roach), R. 409 (Sarreal), R. 826 (Hinke).

Concerning the plaintiff's credibility, ALJ Friedman noted that he showed "no apparent discomfort while sitting or ambulating" during the hearing. (R. 119.) The ALJ concluded:

> I find the claimant partially credible because his allegations are not to the degree alleged. Specifically, he testified that he can travel on his own via public transportation, he does artwork with both arms, and hands, and he could lift and carry 10 to 20 pounds. More importantly, his functioning is substantially norma[l], and other than his treating doctor who found that claimant is totally disabled, the objective records showed only mild impairments of the lumbar area and left shoulder. Finally, he does not use any assistive device, and while there are demonstrated limitations on reaching, he had successful left shoulder surgery with positive results from post-surgery rehabilitation.

(*Id.*)

Finally, relying on the vocational expert's testimony, the ALJ concluded that although plaintiff could not perform his past work, he would be able to perform the jobs of marker, usher, or counter clerk. (R. 120.) On this basis the ALJ found that "the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy," and he concluded that plaintiff was not disabled within the meaning of the Act. (*Id.*)

## V.    ANALYSIS

As noted above, plaintiff argues that the ALJ erred when determining his RFC by failing to give the opinion of his treating physician the weight it deserved and by finding plaintiff's assertions about his symptoms only "partially credible." Pl. Mem. at 12 (citing R. 119). The Commissioner argues that the ALJ provided "good reasons" for not assigning controlling weight to Dr. Malachovsky's opinion and that his RFC determination, and hence his conclusion that plaintiff was not disabled, was "supported by the medical evidence and record as a whole," as was the ALJ's credibility determination. Comm'r Mem. (Dkt. No. 15) at 18, 22. Because I agree that the ALJ misapplied the treating physician rule, this action will be remanded for further proceedings.

### A.    Substantial Evidence

An ALJ's determination as to whether an SSI claimant is disabled is entitled to substantial deference. Such a determination may be set aside only if it is based upon legal error or is not supported by substantial evidence. *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995). Absent legal error, therefore, the court must grant judgment in favor of the Commissioner if there is sufficient evidence to support the final decision, even if there also is substantial evidence for the plaintiff's position. *See Brault v. Comm'r of Soc. Sec'y*, 683 F.3d 443, 448 (2d Cir. 2012) ("The substantial evidence standard means once an ALJ finds facts, we can

reject those facts only if a reasonable factfinder would *have to conclude otherwise*." (quotation marks omitted)); *accord Brown v. Colvin*, 73 F. Supp. 3d 193, 198-99 (S.D.N.Y. 2014).

Neither the claimant nor the reviewing court, however, may be required to guess at the process that the ALJ used to weigh and analyze the evidence before him. Rather, "in order to accommodate 'limited and meaningful' review by a district court, the ALJ must clearly state the legal rules he applies and the weight he accords the evidence considered." *Rivera v. Astrue*, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted). An ALJ who fails to provide an adequate roadmap for her reasoning deprives the court of the ability to determine accurately whether her opinion is supported by substantial evidence; in these cases, remand is appropriate. *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999); *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) ("[T]he crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.").

If the ALJ adequately explains her reasoning, and if the resulting conclusion is supported by substantial evidence, the district court may not reverse or remand simply because it would have come to a different decision on a *de novo* review. *See Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("[T]he court should not substitute its judgment for that of the Commissioner."); *Ryan v. Astrue*, 5 F. Supp. 3d 493, 502 (S.D.N.Y. 2014) ("[T]his Court may not substitute its own judgment as to the facts, even if a different result could have been justifiably reached upon *de novo* review.") (quoting *Beres v. Chater*, 1996 WL 1088924, at *5 (E.D.N.Y. May 22, 1996)); *Cleveland v. Apfel*, 99 F. Supp. 2d 374, 379 (S.D.N.Y. 2000) ("This Court may not substitute its own judgment for that of the ALJ, even if it might have reached a different result upon a de novo review.").

### B.    The Treating Physician Rule

When weighing and analyzing opinion evidence, the ALJ must give controlling weight to the opinion of the claimant's treating physician so long as that opinion is well-supported by

medical findings and is not inconsistent with other evidence in the record. 20 C.F.R.

§ 416.927(c)(2). The rule recognizes that treating physicians are "most able to provide a detailed,

longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective

to the medical evidence that cannot be obtained from the objective medical findings alone or from

reports of individual examinations, such as consultative examinations or brief hospitalizations."

20 C.F.R. § 416.927(c)(2); *see also Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983)

("The opinion of a treating physician is accorded extra weight because the continuity of treatment

he provides and the doctor/patient relationship he develops place him in a unique position to make

a complete and accurate diagnosis of his patient.").

Opinions from a "one-time consultative physician," by way of contrast, "are not ordinarily

entitled to significant weight." *Jackson v. Colvin*, 2014 WL 4695080, at *20-21 (S.D.N.Y. Jun.

11, 2014), *report and recommendation adopted*, *id*. at *1 (S.D.N.Y. Sept. 3, 2014). *See Selian v.

Astrue,* 708 F.3d 409, 419 (2d Cir. 2013) ("ALJ's should not rely heavily on the findings of

consultative physicians after a single examination."); *Cresno v. Apfel*, 1999 WL 144483, at *7

(S.D.N.Y. Mar. 17, 1999) (consulting physicians' opinions or reports "should be given limited

weight" because "they are often brief, are generally performed without benefit or review of the

claimant's medical history, and at best, only give a glimpse of the claimant on a single day")

(quoting *Cruz*, 912 F.2d at 13)).

In this Circuit, the treating physician rule is robust, though not unassailable.

> Before an ALJ can give a treating physician's opinion less than controlling
> weight, the ALJ must apply various factors to determine the amount of weight
> the opinion should be given. These factors include: (1) the length of the
> treatment relationship and the frequency of examination, (2) the nature and
> extent of the treatment relationship, (3) the medical support for the treating
> physician's opinion, (4) the consistency of the opinion with the record as a
> whole, (5) the physician's level of specialization in the area, and (6) other
> factors that tend to support or contradict the opinion.

*Norman v. Astrue*, 912 F. Supp. 2d 33, 73 (S.D.N.Y. 2012); *see also* 20 C.F.R. § 416.927(c)(2) (listing factors). Consequently, the ALJ can decline to afford the opinion of a treating physician controlling weight where "the treating physician issued opinions that are not consistent with other substantial evidence in the record." *Halloran*, 362 F.3d at 32; *see also Snell*, 177 F.3d at 133 ("When other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given."); *see also* 20 C.F.R. § 416.927(c)(4) (2012) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that medical opinion.").

If the ALJ does not afford controlling weight to the opinion of the treating physician, she must provide "good reasons" for that decision. *Halloran*, 362 F.3d at 32-33 (citing *Schaal*, 134 F.3d at 505); *see also* 20 C.F.R. § 416.927(c)(2) (the Commissioner "will always give good reasons in our . . . decision for the weight we give your treating source's medical opinion").

The ALJ is not required to accept or reject a medical expert's opinion *in toto*; some portions of the opinion may be entitled to greater weight than other portions. However, the ALJ may not "substitute his own expertise or view of the medical proof for the treating physician's opinion." *Slaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see also Garcia v. Barnhart*, 2003 WL 68040, at *6 (S.D.N.Y. Jan. 7, 2003) (an ALJ "must defer questions requiring medical expertise to physicians instead of substituting his own medical conclusions for those already present in the record").

## C.    Application

In this case, the ALJ did not err in declining to assign controlling weight to Dr. Malachovsky's opinion that plaintiff "could only occasionally lift but never carry more than five pounds or lift or carry any weight." (R. 118.) As the ALJ explained, that portion of the treating

physician's opinion was inconsistent with substantial evidence elsewhere in the record, including the opinions of both consultative examiners,[22] as well as the plaintiff's own testimony, at his second hearing, that he could lift a grocery bag with his right arm. (R. 59.) However, the ALJ also discounted Dr. Malachovsky's more significant opinions – which he first articulated in 2012 and reiterated in 2014 and 2015 – that plaintiff's lower back pain prevented him from sitting or standing for more than one hour in an eight-hour workday; that when sitting he would need to stand up every 20-30 minutes and take breaks; and that he would likely be absent from work more than three times per month. (R. 377-80, 794-96, 860.) This was error.

First, the ALJ failed adequately to explain why he refused to give controlling weight to Dr. Malachovsky's opinion on these points. As to the issue of how long the plaintiff could sit or stand, the ALJ gave no reasons at all for rejecting the treating physician's views. As to the issue of absenteeism, the ALJ wrote only that the treating physician's opinion was "not documented in the record." (R. 118.) Given that the plaintiff last worked in 2004, it is not clear how Dr. Malachovsky's absenteeism estimate could have been "documented" other than by his frequent physical examinations of the plaintiff, his own treatment notes, and the medical imaging, which showed, among other things, "several herniated discs with some nerve compression." (R. 672.)

Second, the ALJ failed to identify any objective record evidence that undermined Dr. Malachovsky's opinion as to how long plaintiff could sit and stand at work or how many days he was likely to be absent. To the contrary: as Dr. Hinke wrote on July 17, 2014, the abnormalities shown on plaintiff's x-rays and MRI (which she described as "degenerative disc disease and spondylosis associated with degenerative scoliosis and retrolisthesis") "correlate well with

---

[22] Dr. Sarreal concluded that plaintiff had "mild to moderate limitation in regard to lifting and carrying heavy objects" (R. 410), as well as limitation in "left arm overhead reaching" (*id.*), but only Dr. Malachovsky opined that plaintiff could "never" carry a weight of any kind.

[plaintiff's] pain symptoms and clinical examination." (R. 826-27.) Dr. Chow did not come to any different conclusion. Indeed, as noted above, Dr. Chow never saw any of plaintiff's medical imaging (or other medical records) and thus could not have relied on them for her conclusion that plaintiff could sit, stand or walk for up to eight hours during an eight-hour work day. (R. 805.) For these reasons, Dr. Chow's opinion cannot be viewed as "substantial evidence" undermining Dr. Malachovsky's opinion or, for that matter, independently supporting the ALJ's RFC determination. *See Burgess*, 537 F.3d at 132 (holding that the opinions of non-treating physicians who did not review the plaintiff's MRI could not be used to discount the MRI-supported opinion of her treating physician as to her back pain, and remanding for further consideration of her ability to sit, stand, and walk); *Tarsia v. Astrue*, 418 Fed. Appx. 16, 18 (2d Cir. 2011) (ALJ erred in placing substantial weight on the opinion of a consultative examiner and allowing it to override the opinion of the treating physician where the record was unclear as to whether the consultative examiner reviewed all of the plaintiff's "relevant medical information"); *Jackson*, 2014 WL 4695080, at *20 (finding that the opinion of a consultative examiner who did not review plaintiff's medical records could not override the opinion of a treating physician); *see also Alessi v. Colvin*, 2015 WL 8481883, at *5-6 (E.D.N.Y. Dec. 9, 2015) ("[T]here is insufficient basis in the record to determine whether Plaintiff had the RFC to perform light work especially because [the consultative examiner], the sole medical source whose functional assessment the ALJ gave great weight to did not review the lumbar and cervical MRIs, which showed some abnormalities.") (internal quotation marks omitted).

To the extent that the ALJ himself believed that plaintiff's "mild" degenerative disc disease and retrolisthesis (R. 117, 118) could not have produced the pain symptoms that plaintiff consistently described, he improperly usurped the role of a medical expert by "substitut[ing] his

own expertise or view of the medical proof for the treating physician's opinion." *Shaw*, 221 F.3d at 134; *see also Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (the ALJ is free to "choose between properly submitted medical opinions," but "is not free to set his own expertise against that of a physician").

Third, the ALJ failed to identify any other evidence in the administrative record that was inconsistent with the opinion of plaintiff's treating physician as to sitting, standing, and absenteeism. Plaintiff himself testified in 2013 that he could stand for "close to an hour," could sit for "[a]bout 45 minutes, an hour," could walk for "three or four" city blocks, but spent "three quarters of the day" lying down to relax his back. (R. 43-44, 47.) He testified in 2014 that he could stand for an hour, or "[u]ntil I get tired," and could sit for "[m]aybe about a half hour, 20 minutes," or "sometimes two hours," depending on "how I feel in my back." (R. 58-59.) He could draw for "maybe a couple of hours, three hours," on good days, but "sometimes it rains like two or three days," in which case "I lie down and rest" and "take the pills." (R. 63-65.) To be sure, plaintiff also testified that he helped his cousin with cleaning and shopping and took public transportation. A short trip to the grocery store, however, is quite different from sitting or standing for six hours during an eight-hour workday. Moreover, it is well-settled law in this Circuit that such activity does not, in itself, contradict a claim of disability, "as people should not be penalized for enduring the pain of their disability in order to care for themselves." *Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000); *see also Balsamo*, 142 F.3d at 81 ("a claimant need not be an invalid to be found disabled under the Social Security Act") (quotation omitted). Even Dr. Sarreal, who generally found plaintiff subject to fewer limitations than Dr. Malachovsky, largely agreed with the treating physician as to sitting and standing, concluding that plaintiff had "mild to moderate limitation" in regard to "prolonged standing" and "prolonged sitting." (R. 410.)

In short, none of the *Norman* factors – singly or in combination – could justify the decision of the ALJ to reject the opinion of plaintiff's treating physician as to sitting, standing, and absenteeism in favor of the opinion of one-time examiner Dr. Chow, whose clinical findings were inconsistent with those of every other examiner and who never saw plaintiff's x-rays or MRI evidence. Therefore, the ALJ's conclusion that plaintiff could "sit, stand, and walk for 6 hours in an 8-hour workday" (R. 115, 119) – making him capable of light work – is not supported by substantial evidence.

In light of the ALJ's failure to follow the treating physician rule, I need not separately reach the question of his credibility determination. On remand, however, I note that it would be error for the ALJ to rely – for this or any other point – on his own observation that the plaintiff "showed no apparent discomfort" while sitting and walking during a brief evidentiary hearing. (R. 119.)[23] *See Harris v. Colvin*, 149 F. Supp. 3d 435, 446 (W.D.N.Y. 2016) (ALJ erred when he "discredited Dr. Spurling's opinion based on his lay assessment of Plaintiff's ability to understand and answer questions at the hearing"); *Spielberg v. Barnhart*, 367 F. Supp. 2d 276, 282 (E.D.N.Y. 2005) (the "ALJ's own observations of the claimant" were "not entitled to much weight since the ALJ is not a medical expert") (citing *Aubeuf v. Schweiker*, 649 F.2d 107, 113 n.7 (2d Cir. 1981)).

## VI.    CONCLUSION

For the foregoing reasons, plaintiff's motion is GRANTED and the Commissioner's cross-motion is DENIED. The case shall be REMANDED for further consideration by the ALJ as to the weight he should assign to Dr. Malachovsky's opinion concerning sitting, standing, and absenteeism, and the effect of that analysis on the ALJ's conclusions regarding the plaintiff's RFC.

---

[23] The 2013 hearing lasted 14 minutes. (R. 38-50.) The 2014 hearing lasted 29 minutes. (R. 53-79.)

On remand, should the ALJ schedule another consultative examination, the examiner must be provided with plaintiff's prior medical records, including relevant imaging. *See* 20 CFR § 416.917.

Dated: New York, New York
        March 28, 2018

**SO ORDERED**.

_____
**BARBARA MOSES**
**United States Magistrate Judge**